UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| MARK A. STILL,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:09 CV 60 ERW / DDN |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Mark A. Still for disability insurance benefits under Title II of the Social Security Act, and supplemental security income under Title XVI of the Act, 42 U.S.C. § 401, et seq. The petition was referred to the undersigned United States Magistrate Judge for review and a recommended disposition in accordance with 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

## I. BACKGROUND

Plaintiff Mark A. Still was born on November 13, 1970. (Tr. 30.) He was 6'3" tall and weighed 378 pounds at the time of the administrative hearing. (Tr. 32.) He has never married, but lives with his girlfriend, their two children, and his girlfriend's child from a prior relationship. (Tr. 39-40.) He completed the ninth grade at Salisbury High School, taking some regular classes and some special education classes due to poor grades. (Tr. 179.) He last worked for a yearbook company for three days, but could not stack books as requested. (Tr. 32.) Prior to that, he was a caregiver for his sister. (Tr. 33.) He last worked on August 7, 2006. (Tr. 113.)

On August 14, 2006, plaintiff applied for disability insurance benefits, alleging he became disabled on April 1, 2005 due to diabetes, high blood pressure, and persistent sores on his feet. (Tr. 113.) He received a notice of disapproved claims on October 6, 2006. (Tr. 18.) After a hearing on February 23, 2009, the administrative law judge denied benefits on March 31, 2009. (Doc. 16.) On October 14, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Id.)

## II. MEDICAL HISTORY

**Diabetes Mellitus with Peripheral Neuropathy**

According to the record, plaintiff visited Chariton Valley Family Medicine approximately every two to four weeks from January 5, 2005 to April 18, 2007. (Tr. 331-39, Ex. 8F; Tr. 340-46, Ex. 9F; Tr. 397-415, Ex. 10F.) Records indicate Dr. Ian Fawks, D.O., partially to fully debrided the diabetic callus surrounding the diabetic ulcer at the base of plaintiff's right big toe on most visits. (Id.) On April 14, 2005, Dr. Fawks first mentioned possibly obtaining diabetic shoes for plaintiff. (Tr. 374.) On April 6, 2007, Dr. Fawks offered to refer plaintiff to a podiatrist, but plaintiff declined the referral. (Tr. 401.) On April 18, 2007, Dr. Fawks noted the ulcer was healing slowly. (Tr. 400.)

On April 25, 2007, plaintiff began seeing Deann White, A.P.R.N., B.C., at the Family Health Center. (Tr. 418.) White noted a one centimeter ulcer with trimmed callus at the base of plaintiff's right big toe. (Id.) An x-ray of plaintiff's right foot showed mild degenerative changes, but was otherwise normal. (Tr. 430.) On May 8, 2007, White noted plaintiff had a normal range of motion, and that his foot was feeling better. (Tr. 419.) On June 8, 2007, White noted that he was going to try to get a pair of diabetic shoes for plaintiff. (Tr. 420.) On July 27, 2007, the ulcer at the base of the right big toe had gotten smaller by half, and plaintiff could walk without assistance. (Tr. 421.) On August 27, 2007, the ulcer was unchanged from July 27, and White ordered diabetic shoes. (Tr. 422.)

On September 4, 2007, Sharon Carmignani, M.D., noted that plaintiff continued to smoke every other day, and needed to stop, but that his health continued to improve. (Tr. 423.) On October 24, 2007, White noted that plaintiff was not regularly wearing the diabetic shoes, despite the fact that they had been ordered. (Tr. 424.) White urged plaintiff to wear the shoes, but noted "compliance is questionable." (Id.)

December 12, 2007 and February 1, 2008 Family Health Center records do not mention plaintiff's foot. (Tr. 434, 435.) On February 15, 2008, Elizabeth Geden, Ph.D., R.N., C.S., F.A.A.N., noted a deep ulcer that needed to be debrided, but that plaintiff "absolutely refused" to go to a wound treatment clinic. (Tr. 436.) On February 29, 2008, Dr. Geden noted that plaintiff thought he was getting better, that the ulcer looked better, that plaintiff was "moving about without any difficulty," and that plaintiff had scheduled an appointment with dermatology. (Tr. 437.) On October 16, 2008, Joseph Camire, D.O., noted that the patient had no edema[1] in his extremities.

On March 3, 2008, plaintiff met with Lindall Perry, M.D., a dermatologist at the Boone Clinic, regarding his diabetic ulcer and callus. (Tr. 444-45.) On all four follow-up visits, Dr. Perry noted the ulcer was improving. (Tr. 442-43, 458-59.)

In late 2008 and early 2009, plaintiff also visited the Moberly Foot Clinic several times. (Tr. 465-69, Ex. 18F; Tr. 482-86,Ex. 21F; Tr. 596-601, Ex. 25F.) Plaintiff admitted to debriding the ulcer on his right big toe himself on several occasions. (Tr. 483-85.) On January 6, 2009, plaintiff reported a second ulcer, this on his left third toe. (Tr. 595.) On February 18, 2009, the last record from the Foot Clinic says there was no edema, erythema[2], or other signs of infection. (Tr. 597.)

---

[1]"Edema: 1. An accumulation of an excessive amount of watery fluid in cells or intracellular tissues. 2. At the gross level, used to describe the physical sign commonly likened to swelling or increased girth that often accompanies the accumulation of fluid in a body part, most often a limb." Stedman's Medical Dictionary 612 (28th ed. 2006).

[2]"Erythema: Redness due to capillary dilation, usually signaling a pathologic condition (e.g., inflammation, infection)." Stedman's Medical (continued...)

During the relevant time period, plaintiff's blood glucose at office visits was sometimes over 200[3], including after he began insulin treatment in November, 2006. On July 7, 2007, Dr. White noted that plaintiff's home blood sugar readings ranged from 160 - 240, and that, according to plaintiff's list of foods he had eaten, plaintiff was eating a lot of "high fat, carbohydrate dense foods." (Tr. 421.)

**Kidney Stones**

On March 22, 2006, plaintiff visited Moberly Medical Center, complaining of abdominal pain and suspected kidney stones. (Tr. 211-14.) A scan showed some calcification, and he was sent home with pain medication and instructions to filter his urine. (Tr. 214, 223.) On March 23, 2006, the next evening, plaintiff returned, complaining of worsened symptoms plus nausea and vomiting. (Tr. 207-09.) He was transferred to University Medical Center due to elevated potassium and creatinine levels. (Tr. 210.) On March 24, 2006, doctors surgically placed stents in both ureters. (Tr. 246.) The records state that plaintiff responded well to the treatment; there is no indication of any complications. (Tr. 284.) On May 19, 2006, a doctor removed the stents. (Tr. 272.) There is no indication in the record of any subsequent kidney problems.

**High Blood Pressure**

The medical records from the relevant time period note hypertension and prescriptions for blood pressure medications. On July 7, 2007, Dr. White noted "fair" control of hypertension. (Tr. 421.) On February 29, 2008, Dr. Geden noted that plaintiff's hypertension was "controlled." (Tr. 437.)

---

[2](...continued)
Dictionary 666 (28th ed. 2006).

[3] Normal blood glucose concentration is 70-110 mg per 100 mL. Stedman's Medical Dictionary 817 (28th ed. 2006).

**Anxiety**

On October 24, 2007, Dr. White indicated that plaintiff was very anxious due to stress at home caused by "financial issues in the court." (Tr. 424.) Plaintiff said he had been overeating and not sleeping well, but Dr. White opted not to prescribe anything for the anxiety. (Id.) He referred plaintiff to a licensed social worker, Jaquelyn Hostetler, who met with plaintiff on October 31, 2007. (Tr. 425.) During this visit, plaintiff stated that he did not want to consider antidepressants because he did not feel his situation was that bad. (Id.) He noted his stepson was having problems in school, and his young son had severe asthma. (Id.) He said he felt like an outcast in a small community due to legal problems with his extended family. (Id.) He agreed to contact vocational rehabilitation to see if he was eligible to use their services. (Id.)

On November 24, 2008, Ms. Carrie Williams, B.A., C.S.S., of Burrell Behavioral Center completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 476-77.) She said that plaintiff's ability to understand, remember, and carry out instructions was affected by his impairment. (Tr. 476.) His impairment moderately impacts his ability to understand and remember simple instructions; understand, remember, and carry out complex instructions; and make judgments on complex work-related decisions. (Id.) His impairment mildly affects his ability to carry out simple instructions and make simple work-related decisions. (Id.) To support these statements, Ms. Williams asserted that plaintiff does not remember names or dates well; she had to remind him of her name multiple times, and she had been meeting with him for about two months. (Id.) She also stated plaintiff is alert but easily distracted, and that he is not good at remembering doctors' appointments. (Id.)

Ms. Williams stated that plaintiff's impairment markedly affects his ability to interact appropriately with the public; moderately affects his ability to interact appropriately with supervisors and respond appropriately to routine work situations and changes; and mildly affects his ability to interact appropriately with co-workers. (Tr. 477.) In support, Ms. Williams said plaintiff has "anger management issues and

deviant behavior toward authority." (Id.)  He believes he does a lot of work at home, but does so only minimally.  (Id.)  Ms. Williams asserted that plaintiff's health contributes to his anxiety; that his anxiety triggers his anger and confusion; and that he feels like giving up most of the time.  (Id.)  The report also stated plaintiff was diagnosed with the impairment described by DSM-IV § 300.02.[4]  (Tr. 477.)  Ms. Williams said that plaintiff does not use alcohol or other substances.  (Id.)

On December 3, 2008 and December 10, 2008, Ms. Williams met with plaintiff.[5]  (Tr. 480-81.)  On December 3, 2008, plaintiff discussed his son's problems in school, and noted the rest of his life was going well.  (Tr. 481.)  On December 10, 2008, plaintiff and his girlfriend agreed that he had improved a lot since he began meeting with Ms. Williams.  (Tr. 480.)

On January 9, 2009, plaintiff began meeting with Shannon Roe, C.S.W., from Burrell Behavioral Center.  (Tr. 595.)  Records from their meetings discuss stress resulting from his son's trouble in school and conflicts with his girlfriend.  (Tr. 590-95.)  Plaintiff said that his ability to work has been limited by "DFS" (Division of Family Services).  (Tr. 595.)  Ms. Roe's notes from January 23 note that the stress from his son's school situation continued, and that plaintiff said his doctor told him he could not go to the YMCA pool to exercise with the open sores on his feet.  (Tr. 593.)

---

[4] DSM-IV § 300.02 is Generalized Anxiety Disorder.  The DSM-IV describes the disorder as "excessive anxiety and worry . . . occurring more days than not for a period of at least 6 months, about a number of events or activities. . . . The anxiety and worry are accompanied by at least three additional symptoms from a list that includes restlessness, being easily fatigued, difficulty concentrating, irritability, muscle tension, and disturbed sleep[.]" Diagnostic and Statistical Manual of Mental Disorders, Text Revision 472 (4th ed. 2000).

[5] Ms. Williams stated in the ability report that she had been meeting with plaintiff since September, 2008, but the two records from December, 2008 are the only ones in the record.  (Tr. 476, 480-81.)

**Testimony at the Hearing**

On February 23, 2009, plaintiff testified before the ALJ. He last worked for three days for a yearbook manufacturer, but quit because he could not stack books, the requested work. (Tr. 32.) Prior to this, plaintiff worked twenty hours per week as a caregiver for his sister. (Tr. 33.) Prior jobs included dock work, cattle work, and various other manual labor. (Tr. 33.)

Plaintiff was diagnosed with diabetes in 2000 by Dr. Prestley[6] when plaintiff went in regarding sores on his feet that would not heal. (Tr. 36.) Dr. Prestley did not begin treatment immediately because plaintiff's diabetes was borderline. (Tr. 36.)

Plaintiff testified that he cannot stand for very long. (Tr. 34.) If he does, he has trouble laying down and sleeping. (Id.) He has the sores on his toes and feet debrided at least twice per month. (Tr. 41-42.) He applies over-the-counter ointment and changes the dressings at home with the help of his girlfriend, Rayma. (Tr. 53.) He said he does not help with any household chores. (Tr. 40-41.)

Plaintiff stated that he falls asleep while watching television once or twice a day. (Tr. 46.) He suffers dizziness or blurred vision approximately three times per week. (Tr. 47.) He associates the term "neuropathy" with shooting pains and numbness in his feet. (Tr. 39.) His fingers and hands "lock up" and fall asleep three to four times a week, and he has trouble holding small objects, like pencils. (Tr. 48.) He has recurring nausea, vomiting, and diarrhea, side effects of the medication Byetta.[7] (Tr. 49-50.) Plaintiff states that he can walk about fifty feet, but he must sit for ten to fifteen minutes after standing or walking for awhile. (Tr. 51-52.) He has been meeting with a counselor about dealing with stress. (Tr. 54.) He stated that he stumbles and falls about four times each month. (Tr. 55.)

---

[6] Plaintiff's testimony is the only mention of Dr. Prestley in the record.

[7] "Byetta is an incretin mimetic. It lowers blood sugar by increasing the release of insulin from the pancreas. It also mimics the actions of certain hormones that lower blood sugar levels." (Tr. 580 from Drugs.com.)

**Written Statements from Steven R. Still and Rayma Shirley**

On July 7, 2008, Steven R. Still, plaintiff's brother, submitted a written statement. (Tr. 449-51.) Mr. Still said that he does not think his brother can work because he cannot walk or stand for long due to the diabetic sores on his feet; he gets disoriented in the heat; he has trouble sleeping; and he is under a lot of stress. (Tr. 449.) He stated plaintiff complains of pain in his feet, legs, and back. (Id.) This pain causes plaintiff to limp and makes it difficult for him to stand up and get comfortable. (Id.) Mr. Still said his brother uses a wheelchair when outdoors, and has to grab on to objects when he walks. (Tr. 450.)

Mr. Still said the amount of time plaintiff can walk varies, but that he is able to stand for ten minutes and sit for twenty minutes. (Id.) He estimated plaintiff can lift fifteen to twenty pounds with each hand, and can lift a total of thirty pounds. (Id.) He cannot perform any household chores. (Id.) Mr. Still said plaintiff gets irritable sometimes due to his pain and health. (Id.) He is stressed frequently because of his inability to work and to pay his bills. (Tr. 451.) He is forgetful sometimes and must be reminded to take his pills. (Id.)

Rayma Shirley, plaintiff's girlfriend, has known him for thirteen years. (Tr. 454.) She stated plaintiff cannot work because he cannot handle the heat or stress, and he has problems with his legs and balance. (Id.) She observes plaintiff experiencing pain in his legs, arms, and back. (Id.) He has a hard time standing up and sitting down, and has difficulty putting on his shoes and socks because he has trouble moving his legs. (Id.)

Ms. Shirley said that plaintiff uses a wheelchair because he has trouble standing and balancing. (Tr. 455.) She estimated he can walk twenty to thirty feet in hot weather; stand for fifteen to twenty minutes; sit for fifteen to twenty minutes; lift fifty pounds with one hand; and lift seventy-five pounds total. (Id.) She also noted that he cannot bathe himself properly due to problems with his left arm and balance. (Id.) He cannot perform any household chores. (Id.) Ms. Shirley said plaintiff is short-tempered and always stressed, causing him to act inappropriately in public. (Id.) She often has to remind him to take his medications and to go to his doctors' appointments. (Id.)

## III. DECISION OF THE ALJ

The ALJ found that insulin-dependant diabetes mellitus with neuropathy and morbid obesity constitute serious impairments. (Tr. 20.) He determined that plaintiff had low-average intelligence, high blood pressure controlled with medication, and temporary problems with kidney stones. (Id.) The ALJ found these conditions are not severe impairments. (Id.) Though plaintiff had been seeing a social worker, there was no evidence from a medically acceptable source of a mental impairment. (Id.) The ALJ determined that the combination of diabetes mellitus with neuropathy and morbid obesity did not constitute a combination of impairments that complied with or were medically equivalent to those listed in 20 CFR 404, Subpart P, Appendix 1. (Tr. 21.) He considered whether the plaintiff's obesity by itself or combined with his other impairments medically equaled any section listing, but determined that it did not. (Id.)

The ALJ went on to find that plaintiff could not perform his prior work, which consisted primarily of manual labor. (Tr. 25.) He noted, however, that while plaintiff's medically determinable impairments produced symptoms, the testimony regarding the intensity, persistence, and limiting effects of the symptoms showed plaintiff has sufficient residual functional capacity to perform sedentary work that is available in the national economy. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary

outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that plaintiff had severe impairments, but those impairments combined did not meet or medically equal one of the impairments listed in 20 CFR §§ 416.920(d), 416.925, or 416.926. (Tr. 20-21.) Plaintiff could not perform his past work, but the ALJ determined that he maintained the RFC to perform sedentary work available in the national economy. (Tr. 21.)

## V. DISCUSSION

Plaintiff argues the ALJ's decision is not supported by substantial evidence, and that the ALJ applied improper legal standards. (Doc. 1.) First, plaintiff argues that the ALJ erred by not adopting as controlling

the opinion of Dr. Camire, plaintiff's treating physician. Second, plaintiff argues the ALJ failed to give sufficient weight to his caseworker's statements. Third, plaintiff argues that the ALJ failed to give sufficient weight to the opinions of his brother and girlfriend. Fourth, plaintiff argues the ALJ failed to consider the impact of his obesity on his ability to work. (Doc. 13.)

**Dr. Camire's Opinion**

Plaintiff first argues that the ALJ erred by not giving controlling weight to Dr. Camire's November 28, 2008 Medical Source Statement. Specifically, plaintiff alleges that the ALJ did not give adequate weight to Dr. Camire's determination of plaintiff's physical limitations when determining that plaintiff had the residual functional capacity to perform sedentary work in the national economy. Plaintiff takes issue with the ALJ's finding that,

> The medical source statement from a treating physician essentially confirms that the claimant can do sedentary work (Exhibit 19F). While it describes a few limitations that could reduce the range of sedentary work the claimant could perform, this Administrative Law Judge did not find those limitations to be supported by the evidence or described by any other medically acceptable source. For instance, the claimant is described as having some difficulty using his hands. However there are no examinations showing anything wrong with the claimant's upper extremities or hands. There is no evidence documenting any motor, sensory or reflex abnormalities in the upper extremities, any weakness or any limitation of motion. The claimant is also described as being limited to less than 2 hours of standing and walking a day. However the medical records consistently show the claimant to be ambulatory without assistance with a normal gait. The claimant describes himself as being able to stand 15 - 20 minutes and to walk 50 feet. He hunts. He can occasionally stand and walk for up to a total of 2 hours a work day.

(Tr. 24-25.)

An ALJ is required to review the record as a whole to determine whether a particular opinion is inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's medical opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's]

case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009)(quoting 20 C.F.R. § 404.1527(d)(2)); see also SSR 96-2p. If the opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can afford it less weight. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). "[A] conclusory statement - that is, a statement not supported by medical diagnoses based on objective evidence - will not support a finding of disability." Id. An ALJ must give good reasons for declining to give a treating physician's opinion controlling weight so that one reviewing the record understands how he determined the weight given to the opinion. Tilley, 580 F.3d at 679; SSR 96-2p.

Dr. Camire's source statement notes that plaintiff is limited in pushing and pulling due to a "tender thoracic lumbar spine"; that he should never climb, balance, crouch, or crawl because that "increases pain and muscle spasms"; that he is limited to walking or standing up to two hours in a day; and that he can frequently lift/carry ten pounds, and occasionally lift/carry up to twenty pounds. (Tr. 472-74.) Dr. Camire's Medical Source Statement also contrarily states that plaintiff's manipulative functions of handling, fingering, and feeling are "unlimited," but also that he could only do those things occasionally. (Tr. 474.) As the ALJ noted, there is no objective medical evidence in the record that supports the limitations on plaintiff's upper body movement. Dr. Camire's own notes show that the plaintiff's extremities were "without edema." His range of motion was always "functional." (Tr. 418-22, 424, 434.) There were no medical assessments of the plaintiff's upper body in the record at all. Thus, Dr. Camire's Medical Source Statement describing plaintiff's occupational limitations is conclusory and not entitled to controlling weight.

In addition, there is substantial evidence to contradict Dr. Camire's assessment of plaintiff's physical limitations. Plaintiff testified that the neuropathy only affected his feet and legs. (Tr. 39.) The medical records on file deal primarily with a chronic diabetic ulcer, controlling plaintiff's blood sugar, an isolated kidney stone incident, and counseling. Though plaintiff testified that his hands "lock up," there was no medical evidence to support this assertion. (Tr. 48, 25.) Plaintiff objects to the ALJ's inference that plaintiff hunts, based on

plaintiff's comment to his social worker that he likes to hunt.[8] Even assuming plaintiff is correct on this point, the plaintiff also told Dr. Fawks in April, 2007 that he was hauling scrap aluminum "on the side" for income. (Tr. 401.) Though plaintiff testified that he does not help around the house at all, he stated in his initial disability application that he washes laundry. (Tr. 40-41, 152.) There is substantial evidence that contradicts Dr. Camire's assessment of limitations, and therefore the ALJ was not required to give it controlling weight.

Finally, plaintiff's claim that the ALJ failed to properly evaluate the factors in 20 C.F.R. § 404.1527(d) is without merit. These factors include the examining relationship, treatment relationship (including the duration, nature, and extent of that relationship), the supportability and consistency of the doctor, and the specialization of the physician. 20 C.F.R. § 404.1527(d). The ALJ questioned plaintiff regarding the length of his treatment relationship with Dr. Camire, his primary care physician (six months to one year). (Tr. 35.) In the sentences preceding those plaintiff takes issue with, the ALJ adopts some of the treating physician's limitations on how much exertion the plaintiff can manage, including that he "can sit for most of the work day, he can occasionally stand and walk for up to two hours total during a work day and he can lift and carry up to 10 lbs." (Tr. 24.) The ALJ referenced specific evidence in the record that contradicted Dr. Camire's assessment, satisfying the "good reasons" requirement. The ALJ properly considered the factors laid out in 20 C.F.R. § 404.1527(d), and diminished the weight assigned Dr. Camire's Medical Source Statement for proper reasons.

**Carrie Williams's Statement**

Plaintiff next alleges that the ALJ erred by failing to outline and evaluate Carrie Williams's opinion in light of her interaction with plaintiff as his social worker. The undersigned disagrees for the reasons set forth below.

---

[8]Plaintiff also mentioned in his initial application for disability benefits that he liked to hunt and fish, but he has to sit on the ground now to do so. (Tr. 154.)

Ms. Williams is identified in the record as a Community Support Specialist for Burrell Behavioral Center. (Tr. 480.) Ms. Williams is not designated as any type of medical source. (Tr. 480; 20 C.F.R. § 416.913(a).) As such, she is an "other source." 20 C.F.R. § 416.913(d). She completed the "Medical Source Statement of Ability to do Work-Related Activities (Mental)." (Tr. 476.) While medically non-acceptable sources and other sources should be considered when evaluating the severity and extent of an impairment, a medically-acceptable source must first establish that an impairment exists. 20 C.F.R. § 416.913(a); Thornton v. Astrue, 337 F. App'x 600, 602 (8th Cir. 2009); SSR 06-03p. Here, though Ms. Williams states that plaintiff was diagnosed with 300.02 DSM-IV (General Anxiety Disorder), there is no medically-acceptable source in the record evincing this evaluation and diagnosis. Thus, the ALJ correctly held that plaintiff has no medically-established mental impairment, and afforded Ms. Williams's opinion appropriate weight as an "other source."

Even assuming Ms. Williams's statements regarding plaintiff's limitations could be attributed to his medically-established physical impairments (diabetes mellitus with neuropathy and morbid obesity), the ALJ afforded her assessment appropriate weight as an "other source." SSR 06-03p recommends evaluating "other sources" like counselors and welfare personnel on factors like the nature/extent of their relationship with plaintiff; their qualifications; their specialty or expertise; whether they present relevant evidence in support of their assessment; and whether their statements are consistent with other evidence. See SSR 06-03p; Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (other source opinions entitled to little weight when not supported by objective evidence and inconsistent with other evidence of record).

Though Ms. Williams states on November 24, 2008 that she has been seeing plaintiff since September, there are only two service notes in the record, both from December, 2008. (Tr. 476, 480-81.) Ms. Williams is designated a "B.A., C.S.S." (Tr. 480.) There is no indication of her area of expertise other than these designations. She presents no objective evaluative evidence to support her statements, but only her observations about plaintiff. Finally, her statement is not fully

consistent with other evidence. For example, she states that the plaintiff is not good at remembering doctor's appointments, but based on the medical records, he visited various doctors' offices frequently and with regularity. There is only one indication of a no-show. (Tr. 345.) She states that plaintiff has deviant behavior toward authority, but there is no evidence of this in his interactions with his doctors or his school records. Thus, the ALJ appropriately evaluated and weighed Ms. Williams's statement.

**Opinion of Brother and Girlfriend**

Plaintiff next contends that the ALJ failed to give proper weight to the observational testimony of the plaintiff's brother, Steven Still, and of his girlfriend, Rayma Shirley. This claim fails as well.

The ALJ must consider a claimant's subjective complaints. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007). When evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the "Polaski" factors, which have been incorporated into the Commissioner's regulations. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005); 20 C.F.R. § 416.929(c). The ALJ must consider the opinions of third parties when determining the severity and intensity of a claimant's symptoms if those statements "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(3). When rejecting a claimant's subjective complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802.

In his opinion, the ALJ outlined the factors listed in 20 C.F.R. § 416.929(c)(3). (Tr. 21-22.) He expressly said that both plaintiff's brother and girlfriend had submitted statements. (Tr. 22.) The ALJ then stated that he considered the evidence, but "the allegations by the claimant *and his supporters* of symptoms and limitations preventing him from meeting the minimal demands of sedentary work are not consistent with the evidence as a whole, persuasive, or fully credible." (Id.) He then explained the medical evidence that he found contrary to plaintiff's subjective claims of disabling pain, including those statements made by

his supporters. (Tr. 22-25.) Therefore, the ALJ properly evaluated the third-party subjective evidence as required by 20 C.F.R. § 416.929, and properly gave detailed reasons for discrediting the subjective complaints of “the claimant and his supporters.”

**Impact of Obesity on RFC**

Plaintiff asserts that the ALJ failed to properly consider his obesity when determining he had the residual functional capacity to perform a full range of sedentary work available in the national economy. The undersigned disagrees for the following reasons.

When an ALJ identifies obesity as a medically-determinable impairment, the ALJ will consider any resulting functional limitations in the RFC assessment. SSR 02-1p. Here, the ALJ found that plaintiff’s morbid obesity was a severe impairment. (Tr. 20.) The ALJ expressly stated that he considered whether the obesity, alone or with the other impairments, would support a finding of total disability, but found that it did not. (Tr. 21.) When evaluating the plaintiff’s RFC, the ALJ said plaintiff’s “impairments” and their resulting symptoms limited plaintiff to performing sedentary work. (Tr. 22.) He mentioned plaintiff’s weight several times in his decision. (Tr. 22-23.) See Heino v. Astrue, 578 F.3d 873, 881 (holding that an ALJ sufficiently considers the impact of obesity on RFC when he expressly mentions the claimant’s weight multiple times in his decision); Forte v. Barnhart,377 F.3d 892, 896-97 (finding that lack of medical and testimonial evidence that a claimant’s weight imposed additional work-related restrictions could support ALJ’s finding that claimant had RFC to perform sedentary work). The ALJ therefore appropriately considered the plaintiff’s obesity when determining his residual function capacity.

## VI.  CONCLUSION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have fourteen days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on February 3, 2011.